YM

**FILED**

**MARCH 7, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**08 C 1395**

| | |
|---|---|
| DOROTHY LEAKS,<br>on behalf of herself and others<br>similarly situated,<br><br>         Plaintiff,<br><br>   vs.<br><br>ILLINOIS MORTGAGE FUNDING<br>CORPORATION; WMC MORTGAGE<br>CORPORATION; CHASE HOME<br>FINANCE, LLC; BARCLAYS CAPITAL<br>REAL ESTATE, INC., d/b/a HOMEQ<br>SERVICING; and DOES 1-10,<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**JUDGE MAROVICH
MAGISTRATE JUDGE MASON**

**JURY DEMAND**

**COMPLAINT - CLASS ACTION**

**INTRODUCTION**

1.     Plaintiff brings this action to rescind two "subprime" mortgage loan for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226; and to recover damages against a mortgage broker for discrimination under the Fair Housing Act, 42 U.S.C. Sects. 3613 and 3717 and the Equal Credit Opportunity Act, 15 U.S.C. Sect. 1691e.

**JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), 15 U.S.C. §1640 (TILA), 42 U.S.C. Sects. 3613 and 3717 (Fair Housing Act) and 15 U.S.C. Sect. 1691e (Equal Credit Opportunity Act).

3.     Defendants either reside in or transact business in the District.

1

## PARTIES

4.      Plaintiff Dorothy Leaks is an African-American woman who owns and resides in a home at 11361 S. Forest Avenue, Chicago, Illinois 60628.  Her daughter and grand-daughter also live in the home.  Plaintiff works for the Chicago Police Department.  She is an ordinary consumer.

5.      Defendant Illinois Mortgage Funding Corporation ("IMF") is an Illinois corporation with principal offices located at 1815 South Meyers Road, Suite 800, Oak Brook Terrace, IL, 60181.  It is engaged in the business of a residential mortgage loan broker.

6.      Defendant WMC Mortgage Corporation ("WMC") is a foreign corporation incorporated under the laws of California.  It is engaged in the business of originating subprime mortgage loans.  It does business in Illinois.  Its Illinois registered agent and office is Prentice Hall Corporation, 33 North LaSalle Street, Chicago, IL, 60602.  WMC originated more than 26 mortgage loans during 2006.

7.      Defendant Chase Home Finance, LLC ("Chase"), is a limited liability corporation chartered under the laws of Delaware with its principal place of business at 194 Wood Avenue South, Iselin, NJ, 08830.  It does business in Illinois.  It is engaged in the business of servicing residential mortgage loans.  Its registered agent and office are CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL, 60604.  It is named as a necessary party only.

8.      Defendant Barclays Capital Real Estate, Inc. ("Barclays"), which does business as Homeq Servicing ("Homeq") is a Delaware corporation that does business in Illinois. It is engaged in the business of, inter alia, purchasing, holding and servicing sub-prime mortgage loans on Illinois residential properties. Its principal office is located at 200 Park Avenue, New

2

York, NY, 10166.  Its Illinois registered agent and office is Illinois Corporation Service

Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

9.     On information and belief, Barclays or Homeq was the last owner of

plaintiff's loan, prior to plaintiff paying off the loan in July, 2007.

10.     If Barclays or Homeq was not the last owner of plaintiff's loan, the actual

owner(s) is/are named as Does 1-5.

11.     Homeq was the last servicer of plaintiff's loan, prior to payoff.

12.     New Century Mortgage Corporation ("New Century") was the originating

creditor of plaintiff's loan.  However, New Century is not made a defendant because it is

bankrupt.  New Century was a mortgage lender that, prior to its bankruptcy, made more than 26

loans per year.

### FACTS COMMON TO ALL COUNTS

### September, 2006 Loan

13.     Prior to September 6, 2006, plaintiff applied for refinancing through IMF

after seeing an IMF TV advertisement.  On information and belief, plaintiff dealt with an IMF

broker by the name of Andrew Wanda.

14.     Through IMF, WMC agreed to make a loan to plaintiff in the amount of

$199,750.

15.     Plaintiff needed and used the loan for personal, family or household

purposes, namely, refinancing of prior debt incurred for such purposes.

16.     The loan was closed on or about September 6, 2006.  Contrary to

information on the HUD-1 Settlement Statement, the loan was closed in plaintiff's home.

17.    The following are documents relating to the loan:  a mortgage (Exhibit A), a note (Exhibit B), a HUD-1 Settlement Statement (Exhibit C), a Truth In Lending Disclosure Statement (Exhibit D) and two federal Notice of Right To Cancel forms (Exhibit E).

18.    The Notice of Right To Cancel forms provided to plaintiff at closing were incomplete; neither clearly and conspicuously disclosed either the date of the transaction or the final to date to cancel, as required by law (Exhibit E).

19.    WMC made plaintiff a "2/28" adjustable interest rate loan, with a starting interest rate of 9.72% (Exhibit B).  After two years, the rate could increase to 12.72%; in each six-month period thereafter, it could increase by 1.0% up to a maximum rate of 16.22%.

20.     Plaintiff also paid exorbitant closings costs.  Plaintiff paid both a $950.00 "application fee" to WMC (Exhibit C, line 805) and a $996.00 "processing fee" to IMF (line 806).

21.    In addition, IMF charged plaintiff both a $4,499.17 "loan origination fee" (Exhibit C, line 601) and received a $1,997.50 Yield Spread Premium ("YSP") payment from WMC in exchange for increasing plaintiff's interest rate above the rate she actually qualified for.

22.    Following closing, plaintiff was directed to make payments first to Litton Loan Servicing (Exhibit F), then later to Chase Home Finance, LLC (Exhibit G).

23.    On information and belief, ownership of plaintiff's loan was assigned to Chase Home Finance, LLC.  In the event Chase was not the last entity to own plaintiff's loan, the actual owner(s) is/are named as Does 1-5.

### January, 2007 Loan

24.     Just three months after refinancing plaintiff, Mr. Wanda of IMF solicited plaintiff in December, 2006, promising to lower her interest rate if she refinanced with him again.

25.     Prior to January 26, 2007, plaintiff, through IMF, was approved for a loan with New Century in the principal amount of $208,000.

26.     Plaintiff needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

27.     Wanda and IMF represented to plaintiff that she would receive a a loan with a fixed interest rate and that the monthly payment amount would be $1,400, inlcusive of amounts for escrow.

28.     The loan was closed on or about January 26, 2007 in a Pepe's restaurant on Taylor Street in Chicago.  At that time, plaintiff was not provided with any of the closing documents in a form that she could keep, including without limitation the Truth In Lending Disclosure Statement and the federal Notice of Right To Cancel forms.

29.     Her copies of the closing documents were sent to her by overnight courier approximately two weeks later.

30.     When she received her copy of the closing documents, only one federal Notice of Right to Cancel was provided, instead of the two required by law.

31.     The following are documents relating to the loan:  a mortgage (Exhibit H), a note (Exhibit I), a HUD-1 Settlement Statement (Exhibit J), a Truth In Lending Disclosure Statement (Exhibit K) and a federal Notice of Right To Cancel form (Exhibit L).  The mortgage was in favor of MERS.

32.     New Century gave plaintiff a loan with an adjustable interest rate and a balloon payment.

33.     Plaintiff received a starting interest rate of 8.9% for two years, good until February, 2009, at which time the rate could have jumped to 10.4%.  Thereafter, under the terms of the Note the rate could have adjusted by as much as 1.5% in each six month-period, up to a maximum of 15.9% (Exhibit I).

34.     The balloon payment feature meant that plaintiff's final monthly payment would have been $140,913.18 (Exhibit K).

35.     In addition, Exhibit J shows that IMF and New Century charged plaintiff in excess of $9,000 in "points and fees" on a loan of $208,000 (line 1400).  This included two processing fees, one to the broker in the amount of $998.00 (line 805) and one to New Century in the amount of $310.00 (line 806); as well as an "underwriting" fee of $450.000 to New Century (line 808).

36.     Further, as with the WMC loan, IMF both charged plaintiff a direct broker fee and received a YSP payment from the lender to increase her rate.  This time, the "loan origination fee" was $2,999.00 and the YSP was $3,120.00 (Exhibit J, line 812).

37.     Despite Wanda's representations, plaintiff's monthly payment amount was actually $1,918.36.

38.     Plaintiff received little benefit from IMF's second refinancing of her home; the major benefit was to Wanda/IMF and New Century.

39.     Following closing, plaintiff was directed to make payments to New Century (Exhibit M) and, still later, to Homeq (Exhibit N).

6

40.     Ownership of plaintiff's loan was later assigned to Homeq or Barclays.  In the event neither was the last entity to own plaintiff's loan, the actual owner(s) is/are named as Does 6-10.

41.     On information and belief, along with plaintiff's loan Barclays and/or Homeq acquired one or more large pools of loans originated by New Century.

### Facts Relating To Discrimination On the Basis of Race

42.     The direct broker fees IMF received from plaintiff's loan proceeds in each transaction represented more than reasonable compensation for IMF's brokerage services. However, in addition, as set forth above, IMF also received a YSP from the lender in each transaction.

43.     In the mortgage industry, a YSP is an incentive payment by a lender to a broker whose amount is determined by the extent to which the broker successfully induces the borrower to accept an interest rate on the loan that exceeds the lender's base or "par" rate.  The par rate is the minimum rate at which the lender is willing to make the loan based on the applicant's qualifications.

44.     For example, if the broker procures an interest rate on the loan that is .50% above "par," the lender will pay a YSP of, e.g., 0.5% of the principal amount of the loan to the broker.  The amount of the YSP corresponds to the amount of increase in the rate.

45.     The lender's YSP/interest rate formula(s) are found in the lender's rate sheets or similar forms communicated to or posted for brokers on a regular basis.

46.     The lender's payment of a YSP to the broker and the broker's imposition

of the higher interest rate  -- as well as the lender's and broker's decision as to the of amounts of both -- are not based on the applicant's qualifications or credit risk.  By definition, the lender is willing to make the loan at the "par" or "base" rate.

47.   WMC's payment and IMF's receipt of YSPs disproportionately impact minority borrowers such as plaintiff.  Plaintiff and other minorities are, on average, subject more frequently to YSPs and/or larger YSPs because of their race.  This necessarily means that, on average, plaintiff received higher interest rates in her transactions than whites did from the same defendants, regardless of qualifications.

48.   This result is known and intended by defendants.

49.   WMC, a centralized decision-maker in the mortgage lending market, designed and established the YSP incentive structure for its brokers and the formulas according to which it would pay YSPs to obtain corresponding increases in rates.

50.   This result is known and intended by defendants.

51.   WMC pays YSPs so that it can originate loans with higher interest rates, which results in more profitable loans, whether it holds those loans in portfolio or sells them to investors on the secondary market.

52.   WMC's system of paying YSPs delegates significant authority and discretion over loan pricing to IMF and other brokers with whom it does business.  Its system gives and is intended to give brokers incentives to engage in the subjective mark-up of credit applicants' interest rates, without regard to qualification or risk.  WMC permits its otherwise neutral underwriting criteria to be overridden in this manner.  The only constraint is what interest rate the applicant will accept.

53.    WMC is well aware that its policy and practice of paying YSPs to brokers to obtain higher interest rates influences the behavior of IMF and other mortgage brokers, including IMF's behavior in plaintiff's transaction.  That is the policy's intended effect.

54.    As a mortgage broker, IMF seeks to actively sell loan products to its customers, including the terms of the loan product it persuaded plaintiff to accept.

55.    Where IMF receives a YSP from the lender in exchange for selling a higher interest rate to the borrower, it is acting as an agent of the lender, at least with respect to the increase in the rate.  In plaintiff's transaction, IMF was WMC's agent for purposes of setting plaintiff's interest rate above par.

56.    IMF and other brokers through whom WMC originates loans is more effective, on average, in persuading its African-American and Latino credit applicants, relative to its white applicants, to accept unnecessarily higher interest rates and/or larger rate increases.

57.    In addition, in recent years loan pricing disparities and the role of YSPs in causing such disparities have been subjects of numerous credible studies.  On information and belief, these studies and the YSP issue generally, have been the subject of extensive discussion and publication, including in trade journals and other industry channels.  Defendants were on notice of the findings of these studies and related concerns but continued their lucrative practices anyway.

58.    In addition, WMC knows who its likely customers are, including where they live, their general credit profiles and their race or ethnicity.  WMC also knows who its brokers are, including the geographical communities in which they conduct marketing and do business and the race or ethnicity of its brokers' customers.

9

59.     WMC and IMF also intentionally and disproportionately target minorities for higher cost loans, regardless of their qualifications.

60.     WMC and IMF disproportionately target minority borrowers in their product marketing activities in the Chicago area.

61.     In plaintiff's transactions, the total broker compensation received by IMF was excessive and unreasonable, as defined below.

62.     There is no legitimate business reason justifying the discriminatory effect of plaintiff's and other minorities' receipt from defendants, regardless of qualifications, of higher interest rates, on average, than white borrowers.

63.     Alternative pricing practices exist that would not have the same disparate impact on minority borrowers.

64.     As a result of defendants' conduct, plaintiff was twice induced to sign loan documents providing for loans that were unnecessarily expensive and which were made on less favorable terms than loans defendants brokered or made to Caucasians.

65.     Plaintiff will prove her claims of discrimination, in part, through a statistical analysis of defendants' loan transactions, based on quantitative data obtained from defendants' loan files.

## COUNT I – FAIR HOUSING ACT- CLASS CLAIM – CLASS CLAIM

66.     Plaintiffs incorporate paragraphs 1-65.  This claim is against IMF.

67.     The Fair Housing Act, 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in**

the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:

    (1) The making or purchasing of loans or providing other financial assistance--

        (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

        (B) secured by residential real estate.

    (2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

68.    Defendant IMF violated the Fair Housing Act by increasing the interest rates more often and to a greater extent on loans it brokered for minority borrowers, in exchange for receiving higher and/or more frequent YSPs in connection with those loans.

69.    The Fair Housing Act, 42 U.S.C. §3613, provides:

§ 3613.  Enforcement by private persons

(a) Civil action.

    (1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. . . .

(c) Relief which may be granted.

11

**(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).**

**(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. . . .**

## CLASS ALLEGATIONS

70.    Plaintiff rings this claim on behalf of a class consisting of (a) all African-American and Hispanic persons with Illinois addresses, (b) who obtained a loan from any lender through IMF, (c) and paid IMF direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where IMF also received a YSP of not less than 1% of the loan principal or $2,000, whichever is greater, and (e) where the loan was closed on or after a date two years prior to the filing of this action.

71.    The class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of each class.

72.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members.  The predominant common question is whether the payment and receipt of YSPs results in loan terms which are intended to discriminate or have the effect of discriminating against African-American or Hispanic borrowers.

73.    Plaintiff's claim is typical of the claims of the class members.  All are based  on the same factual and legal theories.

74.    Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in mortgage cases and class actions.

75.    A class action is superior to other alternative methods of adjudicating this dispute.   Individual cases are not economically feasible.  The nature of the claim is such that proof of the class-wide impact of YSPs is necessary.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendant for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT II – EQUAL CREDIT OPPORTUNITY ACT- CLASS CLAIM

76.    Plaintiffs incorporate paragraphs 1-75.  This claim is against IMF.

77.    The Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

**(a) Activities constituting discrimination.  It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--**

**(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . .**

78.    Defendant IMF violated the ECOA.

79.    The Equal Credit Opportunity Act, 15 U.S.C. §1691e, further provides:

**Civil liability**

**(a) Individual or class action for actual damages.** Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

**(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award.** Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $ 10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $ 500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

**(c) Action for equitable and declaratory relief.** Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title.

**(d) Recovery of costs and attorney fees.** In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection. . . .

**(f) Jurisdiction of courts; time for maintenance of action; exceptions.** Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation . . . .

## CLASS ALLEGATIONS

80.    Plaintiff brings this claim on behalf of a class consisting of (a) all African-American and Hispanic persons with Illinois addresses, (b) who obtained a loan from any lender through IMF (c) and paid IMF direct compensation of not less than 1% of the loan principal or

$2,000, whichever is greater, (d) where IMF also received a YSP of not less than 1% of the loan principal or $2,000, whichever is greater, and (e) where the loan was closed on or after a date two years prior to the filing of this action.

81.    The class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of each class.

82.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members.  The predominant common question is whether the payment and receipt of YSPs results in loan terms which are intended to discriminate or have the effect of discriminating against African-American and Hispanic borrowers.

83.    Plaintiff's claim is typical of the claims of the class members.  All are based  on the same factual and legal theories.

84.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit cases.

85.    A class action is superior to other alternative methods of adjudicating this dispute.   Individual cases are not economically feasible.  The nature of the claim is such that proof of the class-wide impact of yield spread premiums is necessary.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

d.    Attorney's fees, litigation expenses and costs; and

15

e.        Such other or further relief as the Court deems appropriate.

## COUNT III – FHA AND ECOA - INDIVIDUAL CLAIMS

86.      Plaintiff incorporates paragraphs 1-85.  This claim is brought by plaintiff in her individual capacity against defendant WMC.

87.      In connection with plaintiff's September, 2006 loan, WMC violated the Fair Housing Act and the Equal Credit Opportunity Act in the manner alleged above.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

a.        Declaratory relief;

b.        Injunctive relief;

c.        Appropriate damages;

d.        Attorney's fees, litigation expenses and costs; and

e.        Such other or further relief as the Court deems appropriate.

## COUNT IV – TRUTH IN LENDING ACT – INDIVIDUAL CLAIM AGAINST WMC AND CHASE

88.      Plaintiff incorporates paragraphs 1-41.  This count is against WMC and Chase.

89.      Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.  Sect. 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each**

16

consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47

(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

## GROUNDS FOR RESCISSION

90.    In connection with the loan, WMC failed to provide clear and conspicuous notice of plaintiff's federal right to cancel in that the transaction date and the final date to cancel were not filled out (Exhibit E).

91.    Plaintiff has given notice that she is exercising her federal right to rescind this loan (Exhibit O).

92.    The loan has not been rescinded.  Plaintiff paid off the loan in full with the New Century refinance.  In the 7th Circuit, plaintiff is entitled to rescind the loan even after it has been paid off.

93.    Under 15 U.S.C. Sect. 1641( c), the right to rescind may be exercised against "any assignee."

94.    In addition, 15 U.S.C. Sect. 1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.    A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

18

b.     Statutory damages for the underlying violation;

c.     If appropriate, statutory damages for failure to rescind;

d.     Attorney's fees, litigation expenses and costs; and

e.     Such other or further relief as the Court deems appropriate.

## COUNT V – TRUTH IN LENDING ACT – INDIVIDUAL CLAIM AGAINST BARCLAYS AND HOMEQ

95.     Plaintiff incorporates paragraphs 1-41 and 88-94.  This count is against Barclays and Homeq.

96.     In connection with the loan, New Century failed to provide the required financial disclosures, in violation of 15 U.S.C. Sect. 1637, 12 C.F.R. Sect. 226.18 and the corresponding section of the Official Commentary of the Federal Reserve Board ("FRB") on Regulation Z.  In particular, the TILA Disclosure Statement (Exhibit K) failed to disclose the frequency of payment.

97.     In addition, only one federal Notice of Right to Cancel was provided to plaintiff, instead of the two required by Sect. 226.23(b) (see above).

98.     Further, by the time the Notice of Right To Cancel form was delivered to plaintiff, the final date to cancel inserted in bold type on the form (i.e., January 30, 2007) had passed, conveying the impression that plaintiff's right to rescind had already expired.  This violated 12 C.F.R. Sect. 226.23(b)(5)'s mandate that the Notice "clearly and conspicuously" disclose "the final date to cancel."

99.     On April 27, 2007, plaintiff, through previous counsel, sent notice to defendants that she was exercising her federal right to rescind (Exhibit P).

100.    The loan was not rescinded.  Plaintiff paid off the full principal on the loan in July, 2007, with the assistance of Neighborhood Housing Services of Chicago, a non-profit organization that offers loan programs and counseling for families victimized by predatory home loans.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.    A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b.    Statutory damages for the underlying violation;

c.    If appropriate, statutory damages for failure to rescind;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

### COUNT VI – TRUTH IN LENDING ACT – CLASS CLAIM

101.    Plaintiff incorporates paragraphs 1-41 and 88-100.  This count is against Barclays and Homeq.

102.    The TILA Disclosure Statement in Exhibit K is a standard form document that was regularly used by New Century, including in connection with those New Century loans purchased by Barclays or Homeq.

103.    All Truth in Lending Disclosure Statements in the form represented by Exhibit K violate TILA, Regulation Z, and the Official FRB Commentary in that they fail to disclose the frequency of repayment, as required by law.

## CLASS ALLEGATIONS

104.    Plaintiff brings this claim on behalf of a class, consisting of (a) all natural persons with Illinois residences (b) who entered into a residential mortgage transaction with New Century, (c) received a Truth in Lending disclosure statement in the form represented by Exhibit K, (d) where the loan was or is now held by Barclays or Homeq, and (e) which loan was closed on or after a date three years prior to the filing of this action.

105.    The class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of the class.

106.    There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members.  The predominant common question is simply whether Exhibit K violates TILA.

107.    Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theory.

108.    Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in the prosecution of mortgage cases and class actions.

109.    A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

a.    A declaration that class members have the right and the option to rescind, should they choose to exercise that right upon receiving notice;

b.    Attorney's fees, litigation expenses and costs of suit; and

c.    Such other or further relief as the Court deems proper.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

## **<u>JURY DEMAND</u>**

Plaintiff demands trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

22

## <u>NOTICE OF LIEN</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
al@alhofeldlaw.com

1